## THE GOV. AMES.

(Circuit Court of Appeals, Fifth Circuit. May 14, 1901.)

### No. 943.

SALVAGE—RIGHT TO COMPENSATION—FORFEITURE BY FRAUDULENT CONDUCT.
    The fraudulent conduct of the persons in charge of salvage operations, in attempting to bribe the master of the stranded vessel to agree to an excessive payment, and in delaying the work with a view to magnifying the value of the services, when such fraudulent acts were not partici-

pated in nor known to the owners of the vessels engaged in the 'service, or the men employed, will not work a forfeiture of their right to fair compensation, when the services were successful, and of benefit to the salved vessel.

Appeal from the District Court of the United States for the Eastern District of Texas.

R. V. Davidson, F. D. Minor, and J. J. Browne, for appellant.
M. E. Kleberg, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. The five-masted schooner Gov. Ames, worth about $30,000, burden about 1,690 tons net, laden with a cargo of 2,800 tons of coal, worth about $10,000, on Sunday, May 28, 1899, about 6 o'clock a. m., while on her voyage from Norfolk, Va., to Galveston, Tex., ran aground on a coral reef on the Florida coast, known as "Loo Key Patches," about 30 miles eastward from Key West. She remained aground on the reef until 11 a. m., the following Wednesday, May 31st, when she was successfully floated. This result was produced by the combined efforts of the master and his crew of 13 men, and appliances of the ship, and of the libelants, composed of Thomas Pent, as master wrecker, and Osgood Acosta, assistant master wrecker, the crew of the tug George W. Childs, and the crews of several schooners, making all told 63 men. The libelants had in their service the tug George W. Childs and several small schooners, and commenced work early in the morning of May 28th, and continued their services until the Gov. Ames was floated, her outlying anchors picked up, and the vessel was ready to proceed on the voyage. During the time that the libelants were endeavoring to float the Gov. Ames, besides minor services rendered, they furnished a large 10-inch hawser, which was successfully used; carried out a heavy anchor belonging to the ship, weighing 7,300 pounds, some distance astern; and carried out another heavy anchor, weighing 6,800 pounds, on the port and seaward side of the ship; and jettisoned from 200 to 400 tons of cargo, which was taken up from the forward hold, and thrown overboard, and, to that extent, lightened the ship. These services were salvage services, and this seems to be admitted by the claimants; but it is contended that these services were not rendered in good faith, with a view to a speedy floating of the distressed ship, but rather in bad faith, and for the purpose of keeping the Gov. Ames aground as long as possible, with a view to increasing the salvage award to be allowed for services rendered. This contention was allowed in the district court, which decreed as follows:

"It is therefore ordered, adjudged, and decreed that the salvage of the libelants for their services rendered to the schooner Gov. Ames and cargo, while ashore on the Loo Key reefs, be forfeited on account of their having refused and failed to carry out the anchor on the port bow of said schooner, and having carried out the starboard anchor astern of said schooner, and pulling on her with the tug boat on the starboard side, with a fraudulent view of keeping her on the reefs until they had time to lighten her more than was necessary, and on account of their having placed her in a position

of greater peril and danger, and having unnecessarily employed a large number of men, and, in this manner, fraudulently magnified their services into greater importance than they were entitled to, with a view of a larger compensation than the true situation of the vessel and their fair and necessary services would warrant, whereas the proper manner of placing said anchors, the proper course in salving the said vessel, was evident to be seen by them at the time; and that, for these causes, it is ordered that said salvage be forfeited, and their libel be dismissed; but it appearing to the court from the testimony that the libelants rendered certain services to the said schooner, and that these circumstances make it just that the costs should be paid by the said schooner and cargo, and be adjudged against the respondents."

There is much, maybe a preponderance of, evidence to support this decree, except as to the fraudulent intent ascribed to all the libelants. The controlling libelants persistently declined and refused to carry out and locate an anchor on the port side of the ship, and did not carry it out until the afternoon of Tuesday, May 30th, when the master insisted upon it, threatening to procure other assistance; and the master testifies that prior to the libelants undertaking the salvage, and while negotiating with the master with regard to terms, the master wrecker, Thomas Pent, proposed to bribe the master of the Gov. Ames to agree to a contract for a large compensation by giving him a considerable portion of whatever amount should be agreed upon. It appears, from the soundings taken soon after the Gov. Ames went aground, that the shoal water was directly ahead and to the starboard, and the deep water was astern and to the port and seaward side, and it seems that ordinary seamanship and skill required that as soon as possible a heavy anchor should be put out astern to keep the ship from going ahead and further aground, and one also to the port to keep her from further working in, under the influence of wind and tide. The evidence shows that this was the master's view, and he urged it upon the libelants from the first. The Gov. Ames had no facilities to carry out these anchors. The libelants had a tug, which could, and afterwards did, carry them out. Before the libelants were employed at all, the master of the Gov. Ames offered Assistant Master Wrecker Acosta, who seems to have had some control of the Geo. W. Childs, then lying in the vicinity, $500 if the tug would carry out the heavy anchor to the port side abreast of the ship, which offer, for some reason not shown, was declined, and the libelants would not undertake to do anything until they were put in charge of the ship. After they were put in charge of the ship, not thinking well of the effort, they delayed and neglected to run out the anchor to port until other measures and contrivances had failed. It seems that immediately the anchor was carried out to port, thus preventing the ship from working further in, and furnishing an opportunity to use the ship's appliances to warp her towards the open sea, the ship was able to, and did, draw off the reef at the first high water thereafter. As to the attempt at bribery, the evidence is somewhat conflicting, but sufficient appears to show that if the master wrecker, Thomas Pent, did not attempt to bribe the master to act in bad faith with his owners, he was willing to co-operate in a scheme to procure that result. He testifies:

"When I told the captain of the Ames I would float his ship for $14,000.00, he said to me, 'How much do I get?' I answered, '$2,000.00.' He replied he 'could not do that.' Then I said to him, 'You make a figure.' He replied, 'No; I cannot do that.' Then I told him $12,000 would be my lowest figure. Then he asked me, 'How much are you going to give me out of that?' and I answered, '$1,000.00.' He said, 'No, sir.' Then I said, 'Well, captain, I tell you what I'll do; I'll float your ship, and let it be tried by the admiralty court.' He said, 'No; I do not want it to go into court.' He said, 'Why not have it tried by the underwriters' agent?' I told him, 'All right,' if their figures suited me. He then said, 'Let me go and call my engineer and mate.'"

We find no evidence tending to show that libelants participated in, or knew of, the negotiations or purposes of the master wrecker.

The evidence in the case is voluminous, and we have considered it attentively. Our conclusion is that a fraudulent intent to delay matters in the interest of the salvors is not sufficiently shown by the want of skill and other conduct of the salvors to warrant the denial of all salvage compensation; and as the services rendered were valuable to the Gov. Ames, resulting in eventual success, they should be compensated in a reasonable amount.

Considering the value of the Gov. Ames and her cargo; the number of libelants and their vessels, large and small; the time employed in and about the matter,—in short, all the circumstances of the case,—we conclude that $3,000 is a reasonable amount, and that the same should be allowed. As a distribution according to admiralty rules and principles will be necessary, the cause will be remanded to the district court for further proceedings.

The decree appealed from is reversed, and the cause is remanded, with instructions to enter a decree in favor of the libelants for the sum of $3,000 total compensation for all salvage services rendered to the Gov. Ames, and therein and thereafter proceed in accordance with the views expressed in this opinion and admiralty rules and usages.